Troy P. Foster
Megan Weides
**The Foster Group, PLLC**
518 East Willetta Street
Phoenix, Arizona 85004
Tel: 602-461-7990
tfoster@thefosterlaw.com

Kenneth Frakes
**Bergin Frakes Smalley & Oberholtzer, PLLC**
4343 E. Camelback Road, Ste. 218
Phoenix, Arizona 85018
kfrakes@bfsolaw.com

*Attorneys for Plaintiff-Relator*

FILED
RECEIVED
LODGED
COPY
MAR 19 2020
CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____DEPUTY

SEALED

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| The United States of America,<br><br>*Ex rel.*<br><br>Kendra Burdon,<br><br>Plaintiff/Relator,<br><br>vs.<br><br>Pima Pain Center, an Arizona Corporation; Emil Annabi, M.D.,<br><br>Defendants. | Case No.:<br>**CV20-00123-TUC-RM**<br><br>**FALSE CLAIMS ACT COMPLAINT**<br><br>**Filed Under Seal Pursuant to 31 U.S.C. 3730(b)(2) and Local Rule 5.7** |

For her Complaint against Pima Pain Center ("the Company") and Dr. Emil Annabi ("Owner" or "Individual Defendant"), (collectively "Defendants"), Plaintiff-Relator Kendra Burdon ("Plaintiff" or "Relator"), referred to jointly as "the parties," alleges as follows:

1

## Background Allegations and Jurisdiction

1. Plaintiff, on behalf of THE UNITED STATES OF AMERICA, brings this claim for treble damages and civil penalties against the Defendants based upon the Company's violations of the False Claims Act ("FCA"). *See* 31 U.S.C. § 3729, *et seq.*

2. On behalf of herself, Plaintiff also claims Defendants retaliated against her for reporting these unlawful activities in violation of 31 U.S.C. § 3730(h).

3. This Court has jurisdiction over the Federal FCA claims pursuant to 28 U.S.C. § 1331 and 1345, and 31 U.S.C. §§ 3732(a) and 3730.

4. Venue is appropriate because Defendants transact business in this judicial district. Additionally, Defendants have committed acts proscribed by 31 U.S.C. § 3729 in this judicial district.

5. Plaintiff-Relator (referred to as Relator from herein) Kendra Burdon is a citizen of the United States of America and resides in the State of Arizona.

6. Relator is a certified Nurse Practitioner and formerly worked for Defendants.

7. Relator bring this *qui tam* action based upon direct and unique information obtained during her employment with Defendants.

8. The facts and circumstances which give rise to Defendants' violations of the FCA have not been publicly disclosed in any manner as outlined in 31 U.S.C. § 3730(e)(4).

9. Relator is the original source of the information upon which this Complaint is based, as that term is used in the FCA.

10. Relator has provided a "Relator Disclosure Statement" to the United States Attorney for the District of Arizona prior to filing this Complaint under seal pursuant to 31 U.S.C. § 3730(b)(2).

11. The Company is an Arizona corporation doing business in the State of Arizona and conducting "pain management" for its patients.

12. During her employment and prior to it, Defendants directed its employees, including, Relator, to bill for services not rendered, "up-code" and overbill for services not rendered, bill for services without adequate documentation, provide services that were not

necessary and bill for those unnecessary services, and bill for services rendered by another provider at a higher rate of reimbursement.

13. Moreover, upon information and belief and upon her personal observations, Defendants engaged in a pattern and practice to diagnose and treat pain patients in a manner that was not consistent with physical examinations and for procedures and treatments that would provide Defendants with the highest reimbursement and recovery of Government monies, without regard to the patients' needs.

14. Defendants acted through their agents and employees, and the actions of those agents and employees were within the course and scope of their employment.

## Regulatory Landscape and Governing Law

15. The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §1395 *et seq.*, (hereinafter "Medicare") is a Health Insurance Program administered by the Government of the United States that is funded by taxpayer revenue. The program is overseen by the United States Department of Health and Human Services through the Centers for Medicare and Medicaid Services ("CMS"). Medicare was designed to be a health insurance program and to provide for the payment of hospital services, medical services and durable medical equipment to persons over sixty-five (65) years of age and others that qualify under the terms and conditions of the Medicare Program. Payments made under the Medicare Program include payment for certain pain management services provided, and purported to be provided, in this case.

16. Reimbursement for Medicare claims is made by the United States through CMS which contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395u. In this capacity, the carriers act on behalf of CMS.

17. The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (hereafter "Medicaid"), is a Health Insurance Program administered by the United States and the various individual States, and is funded by State and Federal taxpayer revenue. The Medicaid Program is overseen by the United States Department of Health and

Human Services through CMS. The States directly pay providers, with the States obtaining the federal share of the payment from accounts which draw on the United States Treasury. 42 C.F.R. §§ 430.0-430.30 (1994). Medicaid was designed to assist participating states in providing medical services to financially needy individuals that qualify for Medicaid; among those are pain management services provided, and purported to be provided, in this case.

18. The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") (now known as "TRICARE"), 10 U.S.C. §§ 1071-1106, provides benefits for health care services furnished by civilian providers, physicians, and suppliers to members of the Uniformed Services and to spouses and children of active duty, retired and deceased members. The program is administered by the Department of Defense and funded by the Federal Government. CHAMPUS pays for, among other items and services, certain pain management services; among that care are visits provided, and purported to be provided, in this case.

19. The Federal Employees Health Benefits Program ("FEHBP") provides health care benefits for qualified federal employees and their dependents. It pays for, among other items and services, certain pain management services for its beneficiaries; among these services are visits provided, and purported to be provided, in this case.

20. The Federal FCA, 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim.

21. The Federal FCA, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making, using, or causing to be used or made a false record or statement material to a false or fraudulent claim paid or approved by the Government a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of $5,500 and $11,000 per claim.

22. The Federal FCA, 31 U.S.C. §. 3729(a)(1)(C), makes any person who conspires to commit a violation of the FCA liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim.

23. The Federal FCA, 31 U.S.C. § 3729(a)(1)(G), makes any person who "knowingly" makes, uses or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, liable for three times the amount of the damages the Government sustains and a civil monetary penalty of $5,500 and $11,000 per claim.

24. The FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested. *See* 31 U.S.C. § 3729(b)(2).

25. Physicians and hospitals enter into Provider Agreements with CMS in order to establish their eligibility to seek reimbursement from the Medicare Program. As part of that agreement, without which the hospitals and physicians may not seek reimbursement from Federal Health Care Programs, the provider must sign the following certification:

> "I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare."

*See* Form CMS-855A; Form CMS-8551.

26. In addition, the claims themselves, as submitted, contain a similar certification. *See, e.g.,* Form CMS-1500.

27. When a provider submits a claim for payment, he or she does so subject to and under the terms of its certification to the United States that the services for which payment is sought were delivered in accordance with federal law.

28. In the case of Medicaid, each State's Medicaid Program's applicable certifications also incorporate relevant state law.

29. Furthermore, the Federal FCA, 31 U.S.C. § 3730(h), provides relief to employees who have been retaliated against in their employment because of lawful acts done by the employee in furtherance of efforts to stop one or more violations of the FCA. Such retaliation may include discharge, demotion, suspension, threats, harassment or any other type of discrimination in the terms and conditions of employment. The employee is entitled to all relief necessary to make that employee whole, including reinstatement, two times back pay, interest on the back pay, and compensation for any special damages, including litigation costs and reasonable attorney's fees.

30. Defendants have violated the Federal FCA by engaging in the following alleged conduct from at least 2011 to the present ("Violative Period"):  billing for services not rendered, "up-coding" and overbilling for services not rendered, billing for services without adequate documentation, providing services that were not necessary and billing for those unnecessary services, billing non-covered services as covered, and billing for services not provided by the rendering provider in order to obtain a higher reimbursement rate.

31. Defendants unlawfully billed, or caused to be billed, these services to Federal Health Care Programs.

32. Defendants' schemes included, but are not limited to the following actions, all of which violate the Federal FCA:

a. Submitting bills to the Government for services Defendants knew were not rendered or knew were not rendered by the provider represented and/or never seen by an appropriate provider;

b. Submitting bills to the Government for covered services that Defendants knew, were in fact, not covered;

c. Submitting bills to the Government for up-coded services that Defendants knew were not rendered;

d. Directing providers to deliver services, including pain procedures, that were not medically necessary, and billing the Government for those services;

e. Submitting bills to the Government that Defendants knew lacked appropriate documentation and were not compliant with laws and regulations, as certified;

f. Creating and using false records and statements to get false claims paid by the Government;

g. Conspiring to defraud the Government by getting false or fraudulent claims allowed or paid by the Government in furtherance of the object of the conspiracy, which was to promote increased revenue to Defendants' benefit;

h. Knowingly making and using a false record or statement to conceal, avoid or decrease obligations to pay or transmit money or property to the Government;

i. Directing their employees to engage in the unlawful and fraudulent practices articulated above; and

j. Retaliating against Relator and other unlawful activities as described in this Complaint.

**THE COMPANY, ITS OWNER, AND THE COVERED SERVICES**

33. The Individual Defendant owns and operates the Company.

34. The Company began operations in 2011.

35. The Company now has nine offices throughout Pima County, Arizona, and provides pain management services.

36. During Relator's employment, the Company had approximately 15 providers and several supporting staff members, including billers.

37. The Company's services included treatment and procedures for pain of all types.

38. The provider appointments included initial consults, diagnostic tests, follow-up visits, and various procedures.

39. The procedures included opioid prescription for pain management, epidural injections, among other covered treatments.

40. The Company's patient population consisted of approximately 45% Medicare; 35% Medicaid and other Government programs; and the remainder, private insurance or self-pay.

41. During Relator's employment, the Company's providers saw approximately 2,000 patients each week. Most of these patients were covered by Government programs.

## FRAUDULENT BILLING FOR HIGHER REIMBURSEMENT

42. Plaintiff-Relator realleges paragraphs 1-41 as if fully set forth here.

43. In reviewing patient files, which also showed the billing for each, Relator observed a pattern of irregularities.

44. The Company billed the Government for services that Relator performed as if Defendant Dr. Annabi performed them himself.

45. Dr. Annabi had not seen or provided services for any of the thousands of encounters for patients that Relator observed.

46. In fact, Relator had provided all of those services.

47. However, Defendants billed the Government at a physician's reimbursement rate, which is significantly higher than Relator's and other Nurse Practitioners.

48. After this discovery, Relator reviewed additional patient files.

49. Relator discovered a pattern of billing fraud, which involved the Government being charged for services not performed by the rendering provider, and payment of the higher reimbursement rate for each encounter.

50. In fact, physicians were not even present at the clinics when the Government was billed for their services. Those services were, in fact, rendered by Nurse Practitioners whom have a lower reimbursement rate.

51. Relator observed that, accompanying these claims, were the mandated CMS documents, certifying compliance with federal laws and regulations, when, in fact, they were not compliant

52. Rather, Defendants submitted these false certifications in order to receive the significantly higher reimbursement rate from the Government.

53. Relator observed that bills were submitted to the Government for payment or reimbursement.

54. Relator observed that the Government made payment on these claims.

55. Based upon her direct observations and conversations with other Nurse Practitioners about the practice, Relator believes that Defendants submitted hundreds of thousands of fraudulent claims during the Violative Period, provided falsified documents to support payment, and the Government, in fact, made payment on these claims.

56. Relator believes that the fraudulent claims submitted and paid under this scheme could number 700,000 during the Violative Period.

## FALSIFIED CLAIMS FOR SERVICES NOT PERFORMED

57. Plaintiff-Relator reallege paragraphs 1-56 as if fully set forth here.

58. At the outset of her employment, Defendant Dr. Annabi informed Relator that all Nurse Practitioners were to bill at level 3 across the board with an occasional level 4, regardless of the services rendered.

59. Defendants instructed Relator and the other Nurse Practitioners never to bill at a level 2, regardless of the services rendered.

60. Defendants explained that billing too many level 4s might attract the Government's attention.

61. To increase revenue, however, Defendants instructed that all encounters should be a minimum level 3, again regardless of services performed.

62. To assist in achieving this, Defendants' electronic health records' system pre-populated patient visits.

63. This pre-population included assessments and physical examinations, which indicated that providers were listening to heart sounds and doing abdominal examinations for each patient.

64. No providers were listening to heart sounds or conducting abdominal examinations, as the file indicated.

65. Relator cannot even recall seeing a stethoscope at the facility the entire time that she worked there.

66. In Relator's review of records, she observed that the patient records and documentation did not support the billing requirements for claims to the Government.

67. Relator observed that almost all of these claims, lacking in the required documentation, had been submitted for payment to the Government.

68. Accompanying these claims, were the mandated CMS documents, certifying compliance with federal laws and regulations, when, in fact, they were not compliant.

69. Relator also observed that the Government made payment on these claims.

70. Upon information and belief, her direct observations, and Defendants' admissions and direction to Relator, Relator believes that Defendants submitted tens of thousands of claims during the Violative Period that falsified the required certification for payment, and that in reliance on these certifications, the Government paid these claims.

**PATTERN OF FRAUD IN PAIN MANAGEMENT**

71. Plaintiff-Relator reallege paragraphs 1-70 as if fully set forth here.

72. Relator observed a pattern and practice of treatment that was geared to obtain the most Government reimbursement without regard to medical necessity.

73. Relator discussed this with other Nurse Practitioners employed by Defendants that shared her concern.

74. Relator observed that patients were only examined to qualify for treatment, but not examined for the cause of pain or to eliminate potentially unnecessary procedures.

75. As a matter of course, Relator observed that patients that reported pain were treated for cervical nerve root compression when there was nothing wrong at the nerve root.

76. However, Relator was told, and directly observed, that patients were to be examined only for "qualifying" indicators to provide services even when those services were unnecessary.

77. By way of example, a patient with hand numbness and decreased strength could have issues anywhere from the neck to the wrist. However, Defendants engaged in treatment without further assessment; and directed others to do the same.

78. As a pattern and practice, there was no further assessment of the patient.

79. As such, by further example, once a patient with hand numbness and decreased grip strength was identified, Defendants immediately provided epidural injections.

80. For a vast majority of these patients, the procedures were not medically necessary.

81. When patients complained that the epidural injection was not effective – because they were not medically necessary - Defendants instructed its providers to tell patients that they needed to continue receiving epidural injections.

82. These additional epidural injections were not medically necessary; but were documented as such to the Government for reimbursement.

83. As a pattern and practice, when the series of epidural injection procedures are ineffective – because they were not medically necessary – Defendants provided medial branch blocks and radiofrequency ablation.

84. These services were, again, performed when not medically necessary.

85. Rather, they were part of Defendants' fraudulent scheme to obtain reimbursement for medically unnecessary procedures.

86. Finally, as part of the scheme, after these patients' medial branch blocks and radiofrequency ablation were ineffective – again, because they were not medically necessary – Defendants prescribe pain medications.

87. Defendants continue the patients on pain medications indefinitely.

88. Based upon her observations, Defendants' providers rarely examine patients to determine whether the procedures provided are medically necessary.

89. Instead, by Defendants' direction, most of the providers assess to qualify a patient for procedures and provide them, as outlined above.

90. All of these procedures were submitted to the Government with CMS documents certifying that they were medically necessary, when, in fact, they were not.

91. Relator observed that the Government made payment on these claims.

92. Upon information and belief, her direct observations as alleged, her conversations with other providers, and Defendants' patterned direction, Relator believes that Defendants submitted hundreds of thousands of claims during the Violative Period that falsified the required certification for payment, and that in reliance on these certifications, the Government paid these claims.

93. In short, Defendants provided services that were not medically necessary in order to obtain Government reimbursement. Thereafter, Defendants places its patients on pain medications indefinitely.

94. In another instance, Relator relayed concerns about a procedure performed at the wrong site on a patient.

95. Defendants' agent informed Relator that they would falsify the billing document to receive payment.

96. Upon information and belief, Defendants did, in fact, falsify the certification to obtain payment for the procedure.

## KNOWING VIOLATIONS

97. Plaintiff-Relator realleges paragraphs 1-96 as if fully set forth here.

98. For all of the reasons outlined above, Relator became concerned about the Defendants' unlawful billing practices and providing medically unnecessary services to patients.

99. Relator discussed her concerns with other practitioners, who also shared her concerns.

100. Relator observed several employees leave the Company because of the fraudulent practices.

101. Relator observed Defendants retaliate against employees that departed or expressed concerns about the fraudulent practices.

102. Relator provided her notice to Defendants in January 2020.

103. Relator was then subjected to Defendants' retaliation, as a result.

## LEGAL CLAIM:

## FALSE CLAIMS ACT VIOLATIONS

104. Plaintiff-Relator realleges paragraphs 1-103 as if fully set forth here.

105. Relator, on behalf of the United States seeks recovery of treble damages and civil penalties under the False Claims Act, 31 U.S.C. 3729, against Defendants for knowingly causing false claims to be presented to Government Healthcare Programs from 2011 to present in the District of Arizona.

106. Defendants knowingly and willfully violated the False Claims Act by causing false claims to be submitted.

107. Defendants knowingly caused healthcare providers to submit CMS-1500, and other claim forms for payment, knowing that such false claims would be submitted to Government Healthcare Programs for reimbursement, and knowing that such Government Healthcare Programs were unaware that they were reimbursing for up-coded services, services not actually provided, and for services that were not medically necessary.

108. All of these were false claims.

109. Relator alleges, as outlined above, that Defendants submitted hundreds of thousands of false claims to the Government.

110. In addition to treble the monies recouped, Defendants should be assessed $5,500 to $11,000 per false claim submitted.

## Conclusion

**THEREFORE**, Relator respectfully requests the following relief:

A. An injunction against Defendants from engaging in the fraudulent acts in violation of the FCA, as outlined above;

B. Recoupment of all false claims paid by the Government;

C. The applicable statutory penalty for each false claim submitted;

D. Relator's appropriate award for prosecuting this action; and

E. Reasonable attorneys' fees and costs for Relator's counsel.

**DATED** this 19th day of March, 2020.

**The Foster Group, PLLC**

*/s/ Troy P. Foster*
Troy P. Foster
518 East Willetta Street
Phoenix, Arizona 85004
*Counsel for Plaintiff-Relator*

--and--

**Bergin Frakes Smalley & Oberholtzer, PLLC**

*/s/ Kenneth Frakes (with permission)*
Kenneth Frakes
4343 E. Camelback Road, Ste. 218
Phoenix, Arizona 85018
*Co-Counsel for Plaintiff-Relator*